# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

---

JEREMIAH ALAN LADD,

                            Plaintiff,

     v.                                  5:13-CV-236
                                              (LEK/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                            Defendant.

---

STEVEN R. DOLSON, ESQ., for Plaintiff
TOMASINA DiGRIGOLI, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable Lawrence E. Kahn, Senior United States District Judge, pursuant to 28 U.S.C. § 636 (b) and Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## I.  PROCEDURAL HISTORY

On August 9, 2010, plaintiff protectively[1] filed for Supplemental Security

---

[1] When used in conjunction with an "application" for benefits, the term "protective filing" indicates that a written statement, "such as a letter," has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits. *See* 20 C.F.R. § 416.340. There are various requirements for this written statement. *Id.*  If a proper statement is filed, the Social Security Administration will use the date of the written statement as the filing date of the application even if the formal application is not filed until a future date.  The actual filing date of plaintiff's application for SSI in this case was August 24, 2010 as reflected in plaintiff's written application for SSI. (T. 165-68).  His protective filing date is reflected in the "Disability Determination and Transmittal" which contained the initial denial of his SSI claim. (T. 41-42).

Income ("SSI") Benefits, alleging disability beginning March 1, 2005. (Administrative Transcript ("T.") at 165-68). Plaintiff's claims were denied initially on October 20, 2010. (T. 41-42). Plaintiff requested a hearing, which was held by video conference on November 17, 2011 before Administrative Law Judge ("ALJ") David S. Pang, and at which plaintiff testified. (T. 19-40). ALJ Pang issued a decision denying benefits on January 13, 2012 (T. 47-54), which became the final decision of the Commissioner when the Appeals Council ("AC") denied plaintiff's request for review on December 31, 2012. (T. 1-6).

## II.  **ISSUES IN CONTENTION**

Plaintiff makes the following claims:

(1)    The ALJ erred in failing to follow the "treating physician rule" and in giving greater weight to the opinion of a consultative physician. (Pl.'s Br. 3-8) (Dkt. No. 14).

(2)    The ALJ's residual functional capacity ("RFC") determination is not supported by substantial evidence. (Pl.'s Br. at 6, 8).

(3)    Because of the errors in weighing the treating physician's opinion and in determining RFC, the hypothetical question posed to the Vocational Expert ("VE") did not take all of plaintiff's limitations into account. (Pl.'s Br. at 8).

Defendant argues that the Commissioner's decision is supported by substantial evidence and should be affirmed. For the reasons set forth below, this court finds that the Commissioner's decision is supported by substantial evidence and will recommend dismissing the complaint.

## III.  APPLICABLE LAW

### A.  Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . .

> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B.    Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)). A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986. In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).

"Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. The ALJ cannot "'pick and choose' evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010). However, an ALJ is not required to explicitly set forth and analyze every piece of conflicting evidence in the record. *See, e.g., Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). A reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

## IV.   FACTS

Plaintiff has not set forth a statement of facts in his brief.[2]  Defense counsel has

included a statement of facts in her brief, and the medical evidence and other factual

evidence is discussed extensively in the ALJ's January 13, 2012 decision, summarized

below. (Def.'s Br. at 1-4, T. 49-54).  The court will adopt the facts as stated by the

ALJ and by defense counsel, with additions or changes as noted.

## V.   ALJ's DECISION

At Step 2 of the disability analysis, the ALJ found that plaintiff had the

following severe impairments: status post deep venous thrombosis ("DVT"),

fibromyalgia, and factor 5 (thick blood), but that none of those impairments alone, or

in combination, met the severity of a Listed Impairment at Step 3 of the analysis. (T.

49).  At Step 4 of the analysis, the ALJ found that, although plaintiff could not

perform his past relevant work as a "bouncer," plaintiff had the RFC to perform light

work, with the additional limitations that plaintiff would require a "sit/stand" at will

option, to be performed at his workstation so that the plaintiff would not be "off task."

(*Id.*)  Plaintiff would never be able to climb ladders, ropes, or scaffolds and would

have to avoid "concentrated exposure" to heavy moving machinery, and avoid all

unprotected heights.  Plaintiff's RFC also precluded him from working with sharp

---

[2] There is a section of plaintiff's brief that is entitled "Statement of Facts," but it only states
the procedural history of the case without discussing any of the medical or non-medical facts in the
record. (Pl.'s Br. at 1-2).

objects.[3]

In making this determination, the ALJ considered plaintiff's claims of severe symptoms. (T. 50). The ALJ found that although plaintiff's impairments could reasonably be expected to cause some of the symptoms alleged, plaintiff's statements regarding the intensity, persistence and limiting effects of those symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC assessment. (*Id.*)

Based upon the additional limitations on plaintiff's ability to perform light work, the ALJ called a VE to testify at the hearing regarding jobs that plaintiff may perform. In response to the ALJ's hypothetical,[4] the VE testified that the plaintiff would be able to make a successful adjustment to other work that exists in significant numbers in the national economy, even if plaintiff needed to be absent from work for one day per month. (T. 53-54). The VE listed occupations such as mail clerk, garment sorter, or marker. (*Id.*)

## VII. TREATING PHYSICIAN/RFC

### A. Legal Standards

#### 1. Treating Physician

While a treating physician's opinion is not binding on the Commissioner, the

---

[3] The limitation on sharp objects is required based on plaintiff's treatment with the blood thinning drug, Coumadin. The concern is that, because of the effect of the Coumadin, plaintiff will bleed excessively if he sustains a cut.

[4] The hypothetical question, assumed an ability to perform light work, but included the additional limitations to light work listed above.

opinion must be given controlling weight when it is well supported by medical findings and not inconsistent with other substantial evidence. *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the treating physician's opinion is contradicted by other substantial evidence, the ALJ is *not* required to give the opinion controlling weight. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must, however, properly analyze the reasons that a report of a treating physician is rejected. *Id.* An ALJ may not arbitrarily substitute his/her own judgment for competent medical opinion. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999).

When controlling weight is not given, the ALJ should consider the following factors to determine the proper weight assigned to a treating physician's opinion: (1) frequency of the examination and the length, nature, and extent of the treatment relationship; (2) the evidence in support of the opinion; (3) the opinion's consistency with the record as a whole; and (4) whether the opinion is from a specialist. See 20 C.F.R. § 404.1527(c); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). The ALJ must properly analyze the reasons that the report of the treating physician is rejected. *Halloran*, 362 F.3d at 32–33.

## 2.   RFC

In rendering a residual functional capacity ("RFC") determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of

other limitations. 20 C.F.R. §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999). An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Id.* (citing, *inter alia*, *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984)). RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.* (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120 (DNH/GHL), 2010 WL 3825629, at *6 (N.D.N.Y. Aug. 17, 2010) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 3. Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. Mar. 25, 1999)). To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two-step analysis of pertinent evidence in the record. *See* 20 C.F.R. §§ 404.1529, 416.929; *see also Foster v. Callahan*, No. 96-CV-1858 (RSP/GJD), 1998 WL 106231, at *5

(N.D.N.Y. Mar. 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ." 20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. §§ 404.1529(c), 416.929 (c). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### B.    Application

Plaintiff argues that the ALJ failed to give appropriate weight to the opinions of Dr. Joy Magsino, M.D., plaintiff's rheumatologist, who diagnosed plaintiff with

fibromyalgia in 2011. Dr. Magsino submitted an RFC evaluation, in relevant part, indicating that plaintiff could sit for fifteen minutes at a time for a total two hours in an eight hour workday. (T. 430). Dr. Magsino also opined that plaintiff could stand for fifteen minutes at a time for a total of four hours in an eight hour workday. He could walk two city blocks before he had to rest or had pain. She found that plaintiff would have to take unscheduled breaks about six times in a day, and would have to rest about thirty minutes prior to returning to work. (*Id.*)

However, she also found that plaintiff could frequently lift and carry up to twenty pounds and occasionally lift and carry up to fifty pounds. He could rarely crouch, squat, or climb ladders, but could occasionally stoop or bend, and could frequently twist or climb stairs. (T. 431). She stated that plaintiff's impairments would produce "good" and "bad" days, and that plaintiff would have to be out of work more than four days per month. (T. 431-32). Dr. Magsino stated that plaintiff also suffered from chondromalacia patella of the right knee and diminished hearing in his left ear. (T. 432). Plaintiff's counsel asked the VE about Dr. Magsino's restrictions at the hearing. Based on Dr. Magsino's restrictions, particularly the statement that plaintiff would have to be absent from work four days per month, the VE testified that plaintiff would be unable to perform light work, even with an unlimited sit/stand option.

The ALJ gave Dr. Magsino's RFC evaluation little weight because it was inconsistent with the "overall medical evidence," and was inconsistent with plaintiff's

own report of trying out for the police academy, riding snowmobiles, and working as a security guard. (T. 52). The ALJ also found that Dr. Magsino's RFC evaluation was not consistent with her own treatment records. Finally, the ALJ noted that Dr. Magsino started treating plaintiff in June of 2011, and she had only examined him twice when she completed the RFC form. (T. 52). The ALJ found that based upon the "short length, nature, and frequency of the treating relationship, her opinion cannot be as persuasive." (*Id.*)

The ALJ gave great weight to the consultative examination by Dr. Kalyani Ganesh, who examined plaintiff on October 14, 2010. (T. 52, 368-71). Dr. Ganesh found that plaintiff had no gross limitations sitting, standing, walking, or in the use of his upper extremities. (T. 370). Dr. Ganesh did state that plaintiff should avoid prolonged sitting and standing based upon his status post-DVT, and that he should avoid working with sharp objects in view of the anticoagulation. (*Id.*) Dr. Ganesh also found that the plaintiff should be allowed to alternate positions. Dr. Ganesh based this RFC on plaintiff's history of recurring DVT in his left lower extremity and his history of left leg injury and bleeding. (*Id.*) The ALJ noted that Dr. Ganesh's RFC evaluation was more consistent with the claimant's own reports "and suggest[ed] greater sustained capacity than the [plaintiff] described in his testimony." (T. 52).

The ALJ's determination is supported by substantial evidence in the record. First, his finding that the short duration of plaintiff's treatment by Dr. Magsino justified giving her opinion less weight, is supported by the evidence. Dr. Thomas

Hanna, M.D., plaintiff's primary care physician, referred plaintiff to Dr. Magsino due to a positive "ANA"[5] in June of 2011, six years after the alleged date of onset. (T. 621). When Dr. Magsino completed her RFC evaluation, she stated on the form that she had only seen plaintiff "twice as a Rheumatology patient since June 2011." (T. 429).

The regulations specifically provide that treating physicians' opinions are given more weight generally due to the nature and extent of their relationship with the plaintiff. 20 C.F.R. 404.1527(c)(2), 416.927(c)(2). The longer that the physician has treated a patient, the more that he or she will be aware of the "longitudinal picture" of the plaintiff's impairment(s). *Id.* If a physician does not have that perspective due to the short length of treatment, the Commissioner does not necessarily need to afford the physician's opinion greater weight. The ALJ was justified in considering the short term of Dr. Magsino's treatment as a factor in the analysis of the weight given to her opinion of plaintiff's RFC,[6] particularly given the other evidence in the record.

Neither plaintiff's activities, nor the medical records are consistent with the

---

[5] ANA refers to Antinuclear Anibodies. http://www.rheumatology.org/Practice/Clinical/ Patients/Diseases_And_Conditions/Antinuclear_Antibodies_(ANA)/. These antibodies target "normal" proteins within the nucleus of a cell and could signal the body to begin attacking itself, which can lead to autoimmune diseases. A positive ANA test means only that the antibodies are present, not necessarily that the disease is present. *Id.*

[6] The court notes that the ALJ clearly accepted Dr. Magsino's diagnosis of fibromyalgia, because the ALJ listed fibromyalgia as one of plaintiff's "severe" impairments at Step 2 of the disability analysis and Dr. Magsino was the only physician who diagnosed fibromyalgia. What the ALJ rejected was the extent of the limitations on plaintiff's activities that this impairment would cause.

restrictions to which he testified or consistent with Dr. Magsino's more restrictive 2011 RFC. Plaintiff's first episode of DVT was in February of 2005. (T. 584-85). The physicians first believed that the DVT was only traumatic in nature because plaintiff was pushing his truck when the symptoms began. (T. 584). He was transferred to St. Joseph's Hospital in Syracuse when the anticoagulation with subcutaneous Heparin was not successful at the Oswego Hospital. (*Id.*) At St. Joseph's, plaintiff was placed on a Heparin drip, and a Doppler ultrasound examination was conducted. (T. 585, 589-90). The Doppler revealed a DVT in the left common femoral, deep femoral, superficial femoral, and popliteal veins. (T. 589).

When plaintiff was discharged, he was given Coumadin on a temporary basis while his physicians determined whether the traumatic injury was the sole cause of the DVT or whether there was some genetic factor involved. (T. 588). The physicians hoped that within three to six months after the event, plaintiff would have been able to discontinue the anticoagulation. (T. 588). However, on September 7, 2005, Dr. Wall took plaintiff off the Coumadin in order to test his protein levels without the drug. (T. 270). The testing revealed that plaintiff had a Protein S deficiency, and he would have to be on anticoagulant medicine indefinitely. (T. 271, 609-610).

At that time, the records indicate that plaintiff's leg pain was related only to the DVT, and thus, any limitations on plaintiff's activities, such as the requirement to alternate positions or to avoid prolonged sitting or standing, was related to his status

post-DVT.[7]  In September of 2005, plaintiff went to the hospital again with lower left leg swelling. (T. 576-78).  Dr. Wall found that there was no significant tenderness in the left leg, and a repeat Doppler showed no evidence of DVT. (T. 577).  In October of 2005, shortly after this second hospitalization, plaintiff spoke to Dr. Philipp Wall about stopping his Coumadin because he was applying to the Police Academy.[8]  (T. 272).  Dr. Wall was concerned, based upon plaintiff's DVT, that he would develop further clots without the medication, and said that it was "difficult given the fact that he wants to be active and wishes to be accepted at the police academy." (T. 272).

The fact that plaintiff was applying to the police academy shows that he was feeling sufficiently well and active for this activity.  While plaintiff states that he could not accomplish his goal because of his impairments and the necessity for indefinite anticoagulation, the ALJ did not find that he could be a police officer.  The ALJ found only that plaintiff could perform light work with additional restrictions.  While the failure to enter the police academy may be consistent with plaintiff being unable to perform the strenuous physical activities required of a police officer in

---

[7] As stated above, plaintiff's fibromyalgia symptoms did not appear in the record until June 30, 2011, six years after his stated date of onset when he first was examined by Dr. Magsino. (T. 621).  Dr. Magsino's diagnosis did not appear specifically as fibromyalgia until August 24, 2011. (T. 620).

[8] The record reflects that in 2004, plaintiff was contemplating an application to the Police Academy even prior to his first DVT episode. (T. 539-40).  On November 29, 2004, Dr. Hanna indicated that plaintiff was having a "PE" (physical examination) for "PO" (police officer) Candidate Program. (T. 539).  Dr. Hanna stated that plaintiff was obese, but otherwise healthy at that time. (T. 540).

addition to the dangers associated with anticoagulation, it is not indicative of total disability. In fact, plaintiff's efforts to be accepted at the academy may be more indicative of an ability to perform basic work activities.[9] The ALJ was entitled to consider this fact, along with the other evidence of record, in making his ultimate determination.

Dr. Wall referred plaintiff to Dr. Karen Kaplan, M.D. at Strong Memorial Hospital ("Strong") for evaluation. (T. 600-601). On November 30, 2005, Dr. Kaplan noted that, after several months of Coumadin therapy, the drug was discontinued, but when the doctors took plaintiff off the Coumadin he reported pain and swelling. (T. 601). This improved when plaintiff began taking the Coumadin again. (*Id.*) Dr. Kaplan's findings upon physical examination were essentially normal, except for the status post-DVT. (T. 600). In fact, Dr. Kaplan found minimal edema in the left lower extremity. (*Id.*) Dr. Kaplan's impression was that plaintiff was a 24-year old healthy gentleman who developed a large lower left extremity DVT after trauma to that leg in February of 2005, and he "was likely experiencing postphlebitic syndrome which will cause his leg to continue to swell despite anticoagulation." (*Id.*) Due to the fact that plaintiff continued to have clots, and due to his protein deficiency, he would "very possibly" have to be on anticoagulants indefinitely. (*Id.*)

_____

[9] The issue with respect to the police academy appeared to be plaintiff's need for anticoagulation, together with its risk of excessive bleeding if the plaintiff were injured. That was the reason that plaintiff was taken off the Coumadin; but he could not stay off of the medication because he began to suffer pain and swelling without it.

On March 28, 2006, Dr. Robert E. Carlin, M.D. commented that compression stockings helped plaintiff "significantly" with the edema that he was experiencing in his left leg. (T. 274). Dr. Carlin found that plaintiff had only a small amount of edema and palpable pedal pulses. (*Id.*) Plaintiff gets his blood tested regularly,[10] but other than the records of plaintiff's blood tests, there are very few medical records from 2006 until 2008 or 2009.

On March 7, 2010, plaintiff was in a snowmobile accident. (T. 452). He testified at the hearing that on "that day," he and his brothers were driving snowmobiles, and he drove across the road, hit a bump, and the snowmobile tipped over onto his leg. (T. 27). The ALJ questioned plaintiff about the activity, noting that snowmobiling involves a great deal of "vibration," which might not be good for plaintiff's condition. (T. 28-29). Plaintiff attempted to explain to the ALJ that he just tried the snowmobile and just wanted to have some fun. (T. 28). Plaintiff seemed to be evading the ALJ's question in his testimony, and because credibility is the province of the ALJ, he was entitled to disbelieve plaintiff's attempt to explain away his activities or his implication that this was the first time that he tried such an activity.[11]

---

[10] (T. 325-62, 479-516, 622-40).

[11] Further support for the ALJ's determination is the fact that the only reason that anyone is aware that plaintiff was snowmobiling is that he had an accident and had to go to the hospital, which created a record of his activity. The ALJ was entitled to find that this was not the first time that plaintiff engaged in a higher level of activity, and he was unlucky enough to get caught doing it. The court is not making this finding, but the ALJ, as the factfinder, was entitled to use plaintiff's snowmobiling as a reason to discount his credibility.

In *Kennedy v. Astrue*, 343 F. Appx. 719, 721 (2d Cir. 2009), the Second Circuit affirmed an ALJ's decision, declining to afford great weight to the treating physician's "check-off form regarding residual functional capacity." The court held that although a treating physician's opinion is generally entitled to deference, that opinion need not be afforded great weight when it is not consistent with other substantial evidence of record, including the opinions of other medical experts. *Id.* (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). In this case, as in *Kennedy*, the treating physician's "form" is not corroborated by the contemporaneous treatment notes, by the other medical evidence in the record, nor by plaintiff's own activities. *See also Schmelzle v. Colvin*, No. 6:12-CV-1159, 2013 WL 3327975, at *13 n.19 (N.D.N.Y. July 2, 2013) (citing cases in which the ALJ rejected the treating physician's opinion in favor of the consultative physician).

While it is true that in 2011, plaintiff was diagnosed with fibromyalgia by Dr. Magsino, a review of her contemporaneous progress notes show that notwithstanding the appropriate tender points, on October 19, 2011, plaintiff's joints had "full range of motion except for the right shoulder." (T. 618). When Dr. Magsino first examined plaintiff in June, she stated that he had increased lower back pain for one and one half months. (T. 621). On August 24, 2011, Dr. Magsino noted that plaintiff's cervical and lumbosacral spine x-rays were normal. (T. 619). On October 19, 2011, there was no significant effusion in both knees, but there was increased tenderness on flexion and extension of the right knee compared to the left. (T. 618). Plaintiff's comprehensive

blood panel ("CMP") testing on August 24, 2011 was "totally normal," while his vitamin D levels were low as indicated in the June 2011 test. (*Id.*)  Dr. Magsino stated that plaintiff's vitamin D deficiency was "most likely causing or contributing to multiple joint pain" and prescribed a vitamin D supplement. (T. 617).  Dr. Magsino diagnosed fibromyalgia and chondromalacia in his right knee. (T. 432, 617).  The court also notes that although Dr. Magsino found that plaintiff was very limited in sitting and standing, he could *lift and carry* up to 50 pounds occasionally and 20 pounds "frequently." (T. 431).  Dr. Magsino also opined that plaintiff could "frequently" climb stairs,[12] which would be difficult for an individual with any serious knee impairment.[13]

Conflicts in the evidence are for the ALJ to resolve. *Veino v. Barnhart*, 312 F.3d at 588 (citation omitted).  As the ALJ notes, the record shows that when plaintiff is taking his Coumadin he has been stable (T. 52); and even when the additional diagnoses were made by Dr. Magsino, plaintiff still exhibited normal test results and full range of motion in every joint but his shoulder.  Although plaintiff's right knee

---

[12] The ALJ did not include the ability to climb stairs in his RFC determination. (T. 49).

[13] Plaintiff argues that the Dr. Ganesh's RFC did not have a complete medical record because he did not have the benefit of Dr. Magsino's evaluation which was not made until 2011.  While it is true that Dr. Ganesh examined plaintiff prior to Dr. Magsino, the records show that plaintiff was referred to Dr. Magsino because of a positive ANA test, and plaintiff was not exhibiting symptoms of fibromyalgia until 2011.  Plaintiff exhibited full range of motion and full strength during Dr. Ganesh's examination, and even during Dr. Magsino's examination, plaintiff exhibited mostly full range of motion, notwithstanding the tender points.  The ALJ considered and weighed all the evidence in making his RFC determination.

was then bothering him, the ALJ made adjustments in his RFC for the additional limitations to plaintiff's ability to perform light work to accommodate any additional limitations, including the requirement that he be able to sit or stand at will at his workstation. The fact that plaintiff has fibromyalgia, or that the ALJ has found that the fibromyalgia is a severe impairment, does not automatically lead to a finding of disability. *See Rivers v. Astrue*, 280 F. App'x 20, 22 (2d Cir. 2008) (while fibromyalgia is recognized as a disease that eludes objective measurement, the mere diagnosis of fibromyalgia without a finding as to the severity of the symptoms and limitations does not mandate a finding of disability) (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)). Thus, the ALJ's decision to give less weight to Dr. Magsino's RFC determination is supported by substantial evidence.

## VII. <u>VOCATIONAL EXPERT</u>

### A. **Legal Standards**

Once the plaintiff shows that he cannot return to his previous work, the Commissioner bears the burden of establishing that the plaintiff retains the RFC to perform alternative substantial gainful work in the national economy. *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004). In the ordinary case, the ALJ carries out this fifth step of the sequential disability analysis by applying the applicable Medical-Vocational Guidelines ("the Grids"). *Id.* (citing *Rosa v. Callahan*, 168 F.3d 72, 78 (2d Cir. 1999)). The Grids divide work into sedentary, light, medium, heavy, and very heavy categories, based on the extent of a claimant's ability to sit, stand, walk, lift,

carry, push, and pull. 20 C.F.R. Pt. 404, Subpt. P, App. 2; *Zorilla v. Chater*, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996). *See also* 20 C.F.R. §§ 404.1567 & 416.967. Each exertional category of work has its own Grid, which then takes into account the plaintiff's age, education, and previous work experience. *Id.* Based on these factors, the Grids help the ALJ determine whether plaintiff can engage in any other substantial work that exists in the national economy. *Id.*

"Although the grids are 'generally dispositive, exclusive reliance on [them] is inappropriate' when they do not fully account for the claimant's limitations." *Martin v. Astrue*, 337 F. App'x 87, 90 (2d Cir. 2009) (citation omitted). When significant nonexertional impairments[14] are present or when exertional impairments do not fit squarely within grid categories, the testimony of a vocational expert is required to support a finding of residual functional capacity for substantial gainful activity. *McConnell v. Astrue*, 6:03-CV-0521 (TJM), 2008 WL 833968, at *21 (N.D.N.Y. Mar. 27, 2008) (citing, *inter alia*, *Bapp v. Bowen*, 802 F.2d 601, 605 (2d Cir. 1986)).

## B. Application

In this case, the ALJ found that although plaintiff could perform light work, his ability to perform all, or substantially all, the requirements of light work has been impeded by his additional limitations. (T. 53). The ALJ called a VE to testify. (T. 36-38). The ALJ's hypothetical question asked the VE to assume that plaintiff could

---

[14] A "nonexertional" limitation is a limitation or restriction imposed by impairments and related symptoms, such as pain, that affect only the claimant's ability to meet the demands of jobs other than the strength demands. 20 C.F.R. §§ 404.1569a(c), 416.969a(c).

perform light work, but that he would require the option to sit or stand "at will." (T. 36). The individual would never be able to climb ladders, ropes, or scaffolds, would need to avoid the use of heavy moving machinery and could not be exposed to unprotected heights. (*Id.*) Finally, the individual would not be able to work with sharp objects. (*Id.*)

The VE testified that such an individual could perform three positions: a mail clerk, garment sorter, and a marker. (*Id.*) The ALJ then asked what was the "workplace tolerance" for absences in a particular month, and the VE stated that an individual would generally be unable to be absent more than one day per month. (T. 37). The ALJ then asked the VE to assume that the individual would be required to get his blood drawn regularly. The ALJ asked whether taking "two hours here" or "two hours there" would be acceptable. (*Id.*) The VE testified that it would "vary from employer to employer." (*Id.*)

Plaintiff's attorney questioned the VE and asked whether the tools used by the mail sorter were "sharp," and although the VE stated that the tools were very safe, he also stated that he would "replace" that position with one of the others if plaintiff could not use the tools. (T. 38). Plaintiff's counsel added that the hypothetical individual could only walk two city blocks without rest or severe pain, could only sit or stand for 15 minutes at a time for a total of two hours sitting and four hours standing, and who would require "unscheduled breaks about six times per day for up to 30 minutes." (*Id.*) Plaintiff's counsel essentially tracked Dr. Magsino's RFC

evaluation. The VE stated that such an individual would not be able to perform any work in the national economy. (*Id.*)

Because this court has found that the ALJ properly gave little weight to Dr. Magsino's RFC evaluation, plaintiff's argument that the ALJ was given an improper hypothetical also fails. The ALJ did take into consideration the requirement that plaintiff have his blood drawn regularly, a requirement which no one disputes. The issue is how often plaintiff would have to have this procedure, how long it would take, and whether it would interfere with his ability to work.

The ALJ found that although plaintiff testified that he had to have his blood drawn once per month, but usually more often, as frequently as every day or every other day, the medical evidence shows that he "actually had his blood drawn closer to every month or every two to three months," and that the occasional emergency room treatments and doctor's visits to monitor his DVT and pain in his neck, are not of the frequency alleged by plaintiff. (T. 52). The ALJ's findings are supported by the medical records. A review of the records relating to plaintiff's blood tests shows that although some months between 2005 and 2011, plaintiff did have to have his blood tested more often than once per month, usually it was at most twice per month, unless plaintiff was being monitored more closely for a particular reason such as a change in medication.[15] For example, plaintiff had his blood drawn on August 23, 27, and 30,

---

[15] In 2005, plaintiff had his blood drawn 16 times (T. 503-516); in 2006, plaintiff had his blood drawn 11 times (T. 492-502); in 2007, plaintiff had his blood drawn 10 times (T. 482-91); in 2008, plaintiff had his blood drawn 13 times (T. 479-81, 348-57); in 2009, plaintiff had his blood

2010 and again on September 3, 2010, but the reason for this frequency was that his medication was being changed. (T. 633-37 checking Lovenox and discontinuing Lovenox). In December of 2010, the dosage was increased. (T. 628-29). Overall, however, plaintiff only was required to have his blood tested once per month.

Although plaintiff alleges that the blood testing laboratories did not work around his schedule, it is unclear that plaintiff would have to spend two hours in a laboratory to get his blood drawn or that he could not go at a time that did not interfere with his work. Thus, the ALJ's finding that plaintiff did not have to have his blood drawn as frequently as he alleged is supported by substantial evidence, and the ALJ did not have to include that limitation in the hypothetical question.[16]

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the decision of the Commissioner be affirmed, and the plaintiff's complaint **DISMISSED**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report. Such objections shall be filed with the

---

drawn 6 times (T. 342-47); in 2010, plaintiff had his blood drawn 15 times (T. 325-38, 450, 628-39); and in 2011, plaintiff had his blood drawn 6 times (T. 622-27). The 2011 records may not be complete because plaintiff's hearing was in November of 2011, and all the test records may not have been included in the administrative transcript.

[16] Dr. Magsino also noted in her RFC evaluation that plaintiff would have to take "unscheduled" breaks six times per day and it would take 30 minutes for him to be able to return to work. (T. 430). It is unclear why this requirement was included and appears to be inconsistent with his sitting and standing requirements. If plaintiff is allowed to sit and stand at will, it is unclear why he would be taking "unscheduled breaks," and it is also unclear why it would take 30 minutes for plaintiff to "recover" during the break and what position he would have to take during these breaks.

Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: April 3, 2014

Hon. Andrew T. Baxter
U.S. Magistrate Judge